## RAGLAND et al. v. OVERTON.
### No. 3679.

Court of Civil Appeals of Texas. Amarillo. Nov. 18, 1931.

Rehearing Denied Jan. 6, 1932.

Vickers & Campbell, of Lubbock, for appellants.

Bean & Klett and Lockhart, Garrard & Brown, all of Lubbock, for appellee.

**HALL, C. J.**

H. C. and L. R. Ragland are the owners of lots 13 and 14 in block 99 of the Overton addition to the city of Lubbock. They acquired title by mesne conveyances from the appellee Overton. In the deed from Overton to a former owner, F. E. Wheelock, conveying the lots in question, appears this language: "That I, M. C. Overton, of the County of Lubbock, State of Texas, for and in consideration of the sum of $4,455.00, to me paid by F. E. Wheelock, the receipt of which is hereby acknowledged conditioned, which is hereby agreed to by and between the par-

ties and becomes a part of the consideration, for the hereinafter described lots that when the Vendee, his heirs, assigns or legal representatives, place improvements upon the lots herein conveyed, that the residence to be erected and thereafter maintained shall cost not less than $1,500.00, to be used exclusively for residence purposes and shall front the street known as Broadway. And it is expressly declared that in case this condition is broken by the grantee, his heirs or legal representatives this deed shall become null and void and the title to the premises herein conveyed shall revert to the grantor, his heirs or legal representatives."

This restriction appears in no other deed found in the chain of title from Overton to the Raglands. The Raglands filed this suit to have the restriction declared void, alleging that the two lots were desirable for residential use at the time the said deed was executed in 1908, and continued to be so until about the year 1925, when the Texas Technological College was established and located on land immediately adjacent to, and west of, said lots in the Overton addition. That on account of the college location and improvements on adjoining lands to the west of the Overton addition, demands were created on all of the Overton addition adjoining the college grounds and eastward, for business structures to accommodate the college attendants and the people in that vicinity. That College avenue, a street more than 100 feet in width, was opened, running north and south between Overton addition and the college grounds in the year 1925, and thereupon Broadway and College avenue became main throughfares for traffic of all kinds. That three state highways running through Lubbock enter the city along College avenue and Broadway, and all traffic on said highways is in front of, and along the side of, plaintiffs' lots, which are situated on the corner at the intersection of College avenue and Broadway. That various and sundry businesses had been established on property surrounding their property and in the vicinity of the lots in question. On College avenue there had been built drug stores, cafes, grocery stores, Piggly Wiggly stores, barber shops, beauty shops, tailoring shops, dormitories, boarding houses, floral shops, furniture stores, tourist parks, filling stations and garages, and a steam laundry. That traffic over Broadway and College avenue since 1925 has been heavy, and is increasing with the growth of the college. That more than 2,000 students annually attend the college, and the main entrance to its campus is via Broadway and across College avenue into the college grounds. That several hundred cars and vehicles pass by the plaintiffs' property hourly, day and night. That as a result of the location of the college and the business houses in the vicinity of plaintiffs' lots, and the devotion of contiguous property to business

uses, their said lots have become unsuitable for residential purposes, and are now valuable only for business or commercial uses; and, on account of such radical and material change in the use of the property in that vicinity, it is inequitable to refuse plaintiffs the right and privilege of devoting their property to business purposes. That for business purposes their property is worth $15,000, and is not worth exceeding $3,000 for residential purposes. They prayed for a removal of the restriction contained in the Wheelock deed as a cloud upon their title, and an injunction restraining the defendant from declaring a forfeiture on account of the use of the lots for business purposes. They attack the sufficiency of the above-quoted paragraph from the Wheelock deed as creating a restriction, and further allege that the defendant had waived his right to insist upon the restriction by permitting various and sundry violations of said restriction as to other lots in that vicinity. That he has permitted pee-wee golf courses, grocery stores, a tourist park, and other businesses on other lots in the vicinity, in the title to which there was the same restriction as exists in the title to plaintiffs' lots, and that all such violations of the restrictive condition had lessened the desirability of plaintiffs' lots for residential purposes, and resulted in making them valuable for business uses.

The defendant Overton answered, alleging that the restrictive covenant was absolute, running with the land, and should be enforced and not violated. He alleged that there was a general scheme to restrict all lots on Broadway to residential purposes, and that the plaintiffs' lots and all others on Broadway were desirable for residential purposes only. He admitted that some of the lots on Broadway were used for business and pleasure, but that such use did not impair the lots in question as residential locations. He admitted the location of the college and improvements on the grounds, and that there were other business structures in the vicinity of the lots in question, but that such location did not affect the restrictions. He prayed that the plaintiffs be enjoined from erecting any business house on the lots in controversy, or using said lots for anything except for a residence.

At the conclusion of the evidence, the court directed a verdict in favor of the defendant Overton, and judgment was entered accordingly.

The first contention is that because the evidence showed that the lots were no longer suitable for residential purposes and were adapted for business and commercial use, and more valuable for such use, and since the evidence further showed that the lots were intended to be improved for use in conducting legitimate business with other lots in that vicinity, the trial court erred in directing a

verdict, and in refusing to submit that issue to the jury.

The second contention is that, since it appears that the defendant had permitted other lots under the same restriction as to use to be improved for purposes of business and pleasure, and that some of such lots were in the adjoining block and others in the vicinity of plaintiffs' lots, which had the effect of materially reducing the value of plaintiffs' lots as residential property and tended to make them more valuable for business purposes, he is estopped to assert a forfeiture in the event such lots are used for business purposes.

The third and last contention is that the restriction contained in the Wheelock deed does not in fact forbid plaintiffs using and improving their said lots for business or commercial purposes.

We will not consider the contentions in the order presented.

The testimony shows that the street designated "Broadway," upon which the property involved is situated, runs east and west through the city of Lubbock. That since the establishment of Technological College, and the opening and establishment of College avenue north and south along the east side of the college grounds, the property involved is situated at the end of Broadway, and is on the north side thereof. Overton's addition, through which Broadway runs, was purchased by him in 1908, and lies adjacent to the town section. At that time it was unimproved land, suitable only for residences. The western part of the section was beyond the city limits until about the year 1918. Prior to the location of the college on the Craig section adjoining the Overton addition to the west, Broadway extended through that section. Since College avenue was opened, three state highways running out of Lubbock are routed over Broadway to College avenue, and thence north or south from that intersection. Both Broadway and the avenue have been paved or are in process of being paved. The state has spent about $3,000,000 for buildings and equipment upon the college grounds immediately across College avenue west of plaintiffs' lots, consisting of administration building, women's building, domestic science building, cafeteria, agricultural building, stock judging pavilion, live stock barns, chemistry building, engineering building, textile building, power house, gymnasium, and an athletic field. More than 2,000 students annually attend the college, and those who leave it through the main entrance pass in front of, and by the side of, plaintiffs' lots. During the busy parts of the day, from 300 to 400 automobiles and other vehicles and about twice that number of people pass along College avenue and Broadway hourly; and, in addition, more than 100 pedestrians have been counted every hour. On the same block with the plaintiffs' lots, but across the alley and fronting north, there is a tailor shop, cafe, Piggly Wiggly, drug store, and other buildings. One of the maps shows that within a radius of two blocks from the plaintiffs' lots there is a miniature golf course and about twenty business houses; that there is a tea room across Broadway and opposite the lots in question where about 25 people take meals three times a day; some of the twenty lots are occupied by a bottling works, a steam laundry, dormitories, and other business buildings along College avenue north and south of the lots in question. That at one of the miniature golf courses there is also a shooting gallery to which numerous people resort at night for pleasure, and where they remain until far into the night. This golf course is within the restricted district.

The defendant Dr. Overton testified that he put the restrictive clause in a majority of the deeds conveying the lots along Broadway. "I believe there were some deeds that did not have the restriction in them but I am sure that was just an oversight, just overlooked. If there were ten deeds that did not have any restriction in them, that was just an oversight." When the map which he had made and recorded was given him for inspection, he admitted that there were 33 lots on Broadway which he had sold and conveyed without the restrictive clause.

With reference to the tea room lying immediately across Broadway from the plaintiffs' lots, he stated that he would not call the house a tea room, that he had never tried to stop Mrs. Ragsdale from operating it, and that he considered it merely a residence.

He is contradicted by Mrs. Ragsdale in every material part of his testimony with reference to her property. From time to time she has advertised her tea room by putting up sign boards which were taken down at the request of Overton or her son-in-law. She stated that from the 16th day of September, 1928, she had failed to serve only two meals; that on one occasion Dr. Overton's attorney sent her word to come to his office. She told the messenger that she did not have any business with the attorney, and to tell the attorney that he knew where she lived; that she never heard any more from him; that she called Dr. Overton over the 'phone and asked him if keeping a tea room in her home would be any violation of the restriction, and he stated he thought not; that he first promised to sign a written statement to that effect, and, when some of her neighbors became exercised over the situation, he did not give her the paper, but advised her to change her plans and build a duplex; that she told him she "would not do it and did not and that was all there was to it."

It was further shown that continuing east along Broadway there is a grocery store upon a restricted lot and another golf course in front of the defendant's home. A great many witnesses testified upon the issue as to whether or not the existence of the business houses in the vicinity of the lots in question, and the greatly increased traffic along Broadway to and from the college and in following the three highways which are located upon said streets, affected the value of lots thereon for residential purposes. The majority of this testimony is to the effect that the two lots in question would be more desirable as business property than for a dwelling.

▮ The rule in Texas is that restrictive clauses in a deed or other instrument concerning real estate will be construed strictly against the grantor, and all doubts will be resolved in favor of the free and unrestricted use of the premises. Settegast v. Foley Bros. Dry Goods Co., 114 Tex. 452, 270 S. W. 1014.

▮▮ It will be observed that the restrictive clause in the deed recites that the condition agreed to between the parties is part of the consideration for the lots, and that when the vendee, "his heirs, assigns or legal representatives, places improvements upon the lots herein conveyed, that the residence to be erected and thereafter maintained shall cost not less than $1500.00." This covenant as to the value of the residence to be erected on it by express provision binds the assignees as well as the heirs and legal representatives of the grantee Wheelock. In the forfeiture clause of the restriction, it is provided, "that in case this condition is broken by grantee, his heirs or legal representatives, this deed shall become null and void," etc. The grantee referred to in that clause is necessarily Wheelock, and since the word "assigns" has been omitted, and because forfeitures are not favored, our construction of that part of the restrictive clause is that title would not forfeit and revert to Overton if a residence costing less than $1,500 should be erected upon the property by any subsequent grantee of Wheelock, the original grantee. Since the clause does not appear in any deed subsequently made, the owners of the property who acquired it after Wheelock sold it must be held to have placed a similar construction upon the clause. Allen v. Grant (Tex. Civ. App.) 6 S.W.(2d) 170, 171; Wood v. Stehrer, 119 Md. 143, 86 A. 128.

▮▮ We think the language of the restrictive clause, when considered alone, is sufficient to prohibit the use of the lots for other than residential purposes and to prevent the construction of any dwellings thereon which cost less than $1,500 each. The omission of the word "assigns" from the forfeiture provision will, under a strict construction, pre-

vent a reversion of the title to Overton if the restriction is violated by the plaintiffs, but will not prevent the grantor from bringing his action for injunction and damages if, under the facts, he is entitled to recover upon such grounds. 25 R. C. L. 253, 254; Wood v. Stehrer, 119 Md. 143, 86 A. 128.

As said in 4 Thompson on Real Property, § 3361: "'In this country real estate is an article of commerce. The uses to which it should be devoted are constantly changing as the business of the country increases, and as its new wants are developed. Hence, it is contrary to the well-recognized business policy of the country to tie up real estate where the fee is conveyed with restrictions and prohibitions as to its use; and, hence, in the construction of deeds containing restrictions and prohibitions as to the use of the property by a grantee, all doubts should, as a general rule, be resolved in favor of a free use of property and against restrictions.'"

In the case of Dellaughter v. Hargrove (Tex. Civ. App.) 40 S.W.(2d) 253, it is held that a covenant restricting houses costing less than $1,800 may be waived by silence or conduct, citing Clifton George Co. v. Insurance Co. (Tex. Civ. App.) 234 S. W. 705; Foster v. Bunting (Tex. Civ. App.) 19 S.W. (2d) 784; Johnson v. Poteet (Tex. Civ. App.) 279 S. W. 902.

In 12 Tex. Jur. 150, it is said: "Building restrictions may consist of various specifications, such as those designating a minimum cost of construction, the location of the building, the number and types of buildings which may be erected, and the uses to which they may be put. * * * As to whether a building restriction has been breached is a question of fact depending upon the circumstances of the case, the construction of the covenant, and the acts of the defendant."

In Id., page 168, § 106, it is said: "Where a party brings suit upon the theory that lots within a tract were sold pursuant to a general plan or building scheme, he must, of course, show that such a plan or scheme existed; and it is essential to prove that the land against which the restrictions are sought to be enforced was subject thereto. Doubtless, each lot within the tract is burdened and subject to the restrictions. * * * Presumptions with regard to conveyances import the greatest possible estate, and the least restriction upon the use of the property granted, compatible with the language of the deeds. The mere fact that various deeds from a common grantor contain the same restrictions has been held to be insufficient to show that the establishment of a general plan or scheme was intended, or that such restrictions were imposed for the benefit of any other lots conveyed by the grantor, since the existence of such a general plan or scheme depends not

upon the intent of the common grantor alone, but upon the joint intent of the grantor and the grantees.".

In Id., § 107, it is said: "Uniformity in the restrictions imposed on the lots is one of the strongest proofs of the existence of a building scheme. Consequently, it may be necessary to show the establishment of a uniformly restricted district including the property of the defendant."

Id. § 108 says: "A grantor may waive his right to an injunction by acquiescing in a violation of the restrictions. * * * Where restrictions consist of a general plan or building scheme, subject to which each lot owner in the tract holds his land, the conduct of the common grantor in permitting violations may result in abrogating the entire plan or scheme, and estopping both him and adjoining owners from suing to enforce the restrictions. Similarly, in the case of a suit by an adjoining owner to enforce restrictions, upon the basis of a general building plan, conduct upon the part of the plaintiff, in permitting other violations of the restrictions without any objection, may result in a waiver or estoppel barring his right to enforce the restrictions."

See, also, 46 A. L. R. 372 note; Clifton George Co. v. Great Southern Life Ins. Co. (Tex. Civ. App.) 234 S. W. 705.

Upon the issue of waiver or abandonment of building restrictions in deeds, it is said, in 4 Thompson on Real Property, §§ 3429, 3431:

"A waiver or abandonment of a restriction may be shown by the subsequent conduct of the grantor with reference to the adjoining property for the benefit of which the restriction was imposed. Thus, where the owner of land laid it out in lots intended for residences only, and sold a lot with the restriction that it should not be used for any purpose other than that of erecting a dwelling-house upon it, but afterwards sold the other lots without any restriction whatever, it was held that he had put it out of his power to carry out his plan of using the property for residences only, and a court of equity will not aid him in enforcing the restriction. 'In a general or neighborhood scheme the burden follows the benefit, and where by reason of abandonment, acquiesced in violation, change of character of the neighborhood, or other sufficient cause, the benefit to the property owners affected by the scheme is totally or partially destroyed or impaired, the accompanying burden undergoes a corresponding modification.'"

"If the grantor releases one purchaser from a restriction he cannot himself come into equity to enforce the same restriction against other purchasers, though one purchaser entitled to the benefit of it may enforce it against another who is bound by it. He cannot take away the benefit of his general plan from one purchaser and enjoin a breach of it by another, though he may have a claim for damages at law for such breach by another. 'It is not a question of mere acquiescence,' said Lord Eldon, 'but in every instance in which the grantor suffers grantees to deviate from a general plan, intended for the benefit of all, he deprives others of the right which he had given them to have the general plan enforced for the benefit of all. In such cases I have always understood this court will leave the parties to their remedy at law.' So, if a grantor permits material breaches of a covenant to be committed by some purchasers, he cannot obtain an injunction to compel another purchaser to observe the same covenant. If the grantor is entitled to any remedy it can only be the damages which he may obtain through action at law. The grantor is equally barred of his remedy though the purchaser against whom he seeks to enforce the covenant bought his land and made his covenant after the breaches by the other purchasers had been committed."

■ It appears from the evidence that at the time Overton conceived the idea of making Broadway a street restricted to residences only, Lubbock was a town of a few thousand people. Since that time, the state has established at an expense of about $3,000,000 a great institution of learning at the west end of Broadway. That this college is now attended by approximately 2,000 pupils, and, as a necessary consequence, residences, boarding houses, and business houses have grown up in that vicinity as a result of the improvement; and it further appears that while the grantor may have intended that Broadway should be an isolated sequestered street, to be used for residence purposes alone, it has now become the main thoroughfare between the principal business district of the city and the college addition, and is, moreover, the street upon which three state highways are now designated; and we think this testimony was sufficient to raise the issue as to the changed condition and its effect upon the restriction.

As said in 4 Thompson on Real Property, § 3438: "There may be such a change in the condition of adjacent property and the character of its use that a court of equity will not enforce a restriction of its use for dwelling-houses only and prohibiting every kind of trade or business. Thus, where, after the restriction was imposed, it appeared that an elevated railroad was constructed through the street in which the restricted land was situate, that a station of such railroad covered a portion of the street, its platform occupied half the width of the sidewalk in front of defendant's premises, and from it persons could look directly into the windows, and that this, with the noise of the trains, rendered privacy and quiet impossible, so that large depreciations in rents and frequent vacancies followed the construction of said

road,—it was held that, a contingency having happened not within the contemplation of the parties, which imposed upon the property a condition frustrating the scheme devised by them, and defeating the object of the covenant, thus rendering its enforcement oppressive and inequitable, a court of equity would not decree such enforcement. 'It is true,' says the court, 'the covenant is without exception or limitation, but I think this contingency which has happened was not within the contemplation of the parties. The road was authorized by the legislature, and by reason of it there has been imposed upon the property a condition of things which frustrates the scheme devised by the parties, and deprives the property of the benefit which might otherwise accrue from its observance. This new condition has already affected, in various ways and degrees, the uses of property in its neighborhood and property values. It has made the defendant's property unsuitable for the use to which, by the covenant of the grantor, it was appropriated, and if, in face of its enactment, and the contingencies flowing from it, the covenant can stand anywhere, it surely cannot in a court of equity.' * * * But it often happens that in large cities that it is not for the interest of the community that restrictions put upon land in reference to the quiet residential streets should continue, when the neighborhood is entirely given up to business, unless such restrictions are so expressed as plainly to be binding."

In Id., § 3440, it is said: "If the purpose for which restrictions were imposed can no longer be accomplished, equity will not enjoin their violation. Thus, if the purpose of restrictions was to make and preserve the locality for residences only, and the condition of the locality has greatly changed through the growth of the city, and that part of the city has come to be used chiefly for business purposes instead of residences, and it would be impossible to restore the residential character of the neighborhood by the enforcement of the restrictions upon the land to which they apply, it would be inequitable and oppressive to give effect to the restrictions. In such a case a court of equity will not enforce the restrictions, but will leave the parties to their remedy at law."

To the same effect is the text in Pomeroy's Equity (3d Ed.) page 2596, quoted with approval in Johnson. et al. v. Poteet, supra.

See, also, 8 R. C. L. 1106; 25 R. C. L. 254 and 257.

From these authorities, we conclude that the court erred in instructing a verdict, and that the evidence is sufficient to at least raise the issues whether there was ever a general plan or scheme on the part of the defendant to restrict the whole of Broadway to residen-

tial purposes; whether there had been a waiver of the restrictions; and whether, in view of the changed circumstances, conditions, and surroundings, the plaintiffs were in equity entitled to have the restriction removed as to their two lots.

The judgment is therefore reversed, and the cause remanded.