## OVERTON v. RAGLAND et al.

### No. 3894.

Court of Civil Appeals of Texas. Amarillo.

Nov. 2, 1932.

Rehearing Denied Nov. 23, 1932.

Bean & Klett and Tom Garrard, all of Lubbock, for appellant in error.

Vickers & Campbell, of Lubbock, for appellees.

HALL, C. J.

This case is before us upon a second appeal. It was tried the second time without an amendment of pleadings and upon practically the same testimony as before. For the sake of brevity, we refer to our former opinion in 44 S.W.(2d) 768, for a statement of the issues and the rules of law which in our opinion control the rights of the parties. We also made a brief summary of the testimony bearing upon the issues, and we refer to the former opinion for a full understanding of the case, to which this opinion will be little more than a supplement.

Upon the second trial the case was submitted to a jury upon special issues, and the trial resulted in a judgment canceling the restriction under which the Raglands would have been prohibited from erecting a business house upon the lots in question.

The first three propositions are predicated upon the action of the trial judge in refusing to direct a verdict for Overton. These propositions were urged upon the first appeal where, in effect, Overton contended that the court correctly directed a verdict in his favor. For the reasons stated in the first opinion, they are overruled.

When the case was reversed at a former term, it was for the purpose of submitting issues to the jury for their determination: (1) Whether, in view of the changed circumstances, conditions, and surroundings, the plaintiffs were in equity entitled to have the restrictions removed as to their two lots; (2) whether there had been a waiver of the restrictions; and (3) whether there was ever a general plan or scheme on the part of the defendant to restrict the whole of Broadway to residential purposes.

The first special issue submitted is as follows: "Do you find by a preponderance of the evidence that the changes, if any, in the vicinity of the lots in question, shown by the evidence, have rendered the said lots reasonably unfit for residential purposes?"

Overton had requested the court to submit this issue: "Do you find that the changes, if any, shown by the evidence, have rendered the lots reasonably unfit for residential purposes?"

It will be seen that the material change the court made in submitting this issue was in restricting the changes to the vicinity of the lots in question; so the issue submitted by the court was more favorable to Overton than the one prepared and presented by him.

The second special issue is as follows: "Do you find by a preponderance of the evidence that the defendant Overton has knowingly permitted and acquiesced in a change, if any you find, of Broadway Street from Avenue Q to College Avenue (not including the Jackson property) from a residential street to a business street?"

This second issue is identical with one of the issues requested by the defendant Overton, with the exception that the court prefaced it with "do you find by a preponderance of the evidence."

These issues are attacked by appellant upon several grounds; the principal one being that there was no pleading by plaintiff to the effect that Broadway street has changed from a residence street to a business one.

The general rule is that a litigant on appeal or writ of error may not seek a reversal for error which he himself has committed or invited, even though the error is fundamental. 3 Tex. Jur. 1031, § 731.

The appellant filed no demurrer to the appellees' petition upon the ground that a change of conditions had not been sufficiently alleged. The allegation is: "Broadway Street is a main thoroughfare and intersects College Avenue where plaintiffs' lots of land are located and such is the main entrance into the grounds of the Texas Technological College for all traffic in and to the college and to the respective business establishments along said College Avenue."

And they further alleged that, at the time the original deed containing the restrictive clauses was executed, Lubbock was a town of 2,000 or 3,000 people, since which time Tech. College had been constructed at a cost of approximately $3,000,000, which was attended by about 2,000 pupils, and that the town had since grown to become a city. If there is any question about the sufficiency of these allegations to show a change, the appellant has waived them by not urging his demurrer, and the insufficiency of the petition cannot be raised after verdict and judgment. Southern Casualty Co. v. Morgan (Tex. Com. App.) 16 S.W.(2d) 533.

There is no objection to any testimony introduced for the purpose of showing the change in conditions, circumstances, and surroundings since the execution of the original deed from Overton to Wheelock. Appellant not only permitted the evidence to be introduced without objection, but requested the

above-quoted issues, thereby inviting the error of which he now complains. It is settled that under such circumstances the party who invited the error, as in this case, cannot complain in the appellate court because there are no pleadings authorizing the submission of such an issue. Gladys City Oil G. & Mfg. Co. v. Right of Way Oil Co. (Tex. Civ. App.) 137 S. W. 171; Texas & N. O. R. Co. v. Geiger, 55 Tex. Civ. App. 1, 118 S. W. 179.

Upon the issue of changes in the conditions, circumstances, and surroundings, the appellant insists that, because there is testimony which shows that his lots still have a value of $3,000 as residence property, it does not show that they were not reasonably fit for such purposes.

The court, in the case of Johnson v. Poteet (Tex. Civ. App.) 279 S. W. 902, 905, in discussing the effect of changed conditions, quoted from Pomeroy's Equity (3d Ed.) 2596, as follows: "The equitable jurisdiction to enforce such covenants is subject to one most important limitation. It is not absolute, but is governed by the same general rules which control the equitable relief of specific performance of contracts. If, therefore, the restrictive covenants in deeds of lots were made with evident reference to the continuance of the existing general condition of the property and its surroundings but in the lapse of time there has been a complete change in the character of the neighborhood, so as to defeat the purposes of the covenants and to render their enforcement an inequitable and unjust burden on the owner of the lots, then the equitable relief will not be granted, and the plaintiff will be left to his remedy at law. For example, if the covenants restricted the grantees of lots to use for purposes of residence, and since their execution the whole neighborhood had ceased to be used for such purposes and had been wholly given up to business, manufacturing, and the like"—citing Clifton George Co. v. Great Southern, etc., Co. (Tex. Civ. App.) 234 S. W. 705.

The record shows: That prior to 1908 appellant Overton purchased a section of land adjacent to and immediately west of the section upon which the town of Lubbock was situated. That he had plotted thereon what was known as Overton's addition to the town. That Broadway, as shown upon the map, extended west from the town section through Overton's section to the next section west, which latter section was used for farming purposes and continued to be a farm until about the year 1925, when Texas Technological College was established on the section lying immediately west of Overton's section. Upon the establishment of the college, an avenue called College avenue was established along the east line of the college section, separating said section from the Overton addition and intersecting Broadway at right angles. Until the establishment of College avenue, the farm upon which the college now stands was the west end of Broadway. Since 1925 the state has spent several million dollars erecting buildings and other improvements upon the college section. The record shows: That more than 2,000 pupils attend the college annually, and that the number is increasing from year to year. That College avenue is practically a business street, and only business houses have been erected thereon in the vicinity of the lots in question. That the traffic at the time of the trial along Broadway was fifty times more than when said street was merely a residence district and prior to the establishment of the college. That in the vicinity of the college numerous boarding houses, apartment houses, and places of amusement have become permanently established. That Broadway is a portion of three different federal aided state highways leading out of Lubbock to College avenue, at which point two of them turn south and one north. The same witnesses who estimated the value of the lots in question at $3,000 for residence purposes say they are worth $15,000 for business purposes. Across the street south from the lots in question is what is known as the Yellow House Tea Room, where the owner serves from 75 to 100 meals per day, and has operated it for the past three years with little or no protest from Overton. Inspection of the map shows that the lots in question are near to, if not the center of, the business district, which has grown up in their vicinity since the establishment of the college. In addition to business houses and boarding houses, two peewee golf courses and a grocery store are near the lots in question, and the record shows that the golf courses were extremely popular places of recreation and amusement. Before the establishment of the college, it appears that Broadway was used only for such traffic as is incident to all streets in residence districts of small towns. Now, in addition to busses for carrying passengers, trucks for hauling freight, Broadway is used for commercial purposes and by numerous tourists and pleasure seekers. The map shows that the main entrance to the campus and grounds of the college is directly west of and across College avenue from the west end of Broadway, that during baseball and football games vast multitudes pass in and out of the college grounds, and that Broadway is by far the busiest and most-traveled thoroughfare of the city.

■■ We will not unnecessarily lengthen this opinion by again quoting from the authorities set out in our opinion on the former appeal, and do not hesitate to say that the jury's findings with reference to the changed conditions are amply supported by the testimony. Block 99, upon the southwest corner of which the two lots in question are situated, has thirteen business establishments fronting north on Main street, which runs

east and west and parallel with Broadway. Changed conditions in a neighborhood brought about by agencies outside of the parties themselves will terminate a building restriction limiting or restricting property in use for residential purposes only. Abernathy v. Adoue (Tex. Civ. App.) 49 S.W.(2d) 476.

We overrule all propositions attacking the sufficiency of the evidence to support the findings of the jury upon the issue of a change in surrounding conditions, and we concur in the conclusion that, because of this change, the lots were rendered reasonably unfit for residence purposes.

■ The court did not err in failing to define the word "vicinity" as used in the first special issue. In the first place, it is not a technical, legal term. Besides, its use by the court was to limit the consideration by the jury to facts showing changed conditions, which was favorable to the appellant.

Special issue No. 2 is not subject to any of the objections urged in the briefs.

The next contention, under several propositions, is that appellant, Overton, has not waived the restriction and is not estopped from asserting its validity in this action. The language of the restriction as set out in 44 S.W.(2d) 768, 769, limits improvements by vendees of lots in the district to residences costing not less than $1,500, and contains this provision, "and it is expressly declared that in case this condition is broken by the grantee, his heirs or legal representatives this deed shall become null and void and the title to the premises herein conveyed shall revert to the grantor, his heirs or legal representatives."

This action is filed only against Overton, the original grantor. No vendee of any other lot in the restricted district has intervened or been made a party to the action, and, since the restriction and reversionary clause in the event of a breach seems to indicate that it is personal to Overton, it is questionable whether other grantees could intervene. We do not, however, decide that point.

As said in Goodman v. Bingle (Tex. Civ. App.) 48 S.W.(2d) 432, 433: "As indicated, the language of this restriction appeared alike only once in the respective chains of title of these parties, that is, in the deeds from the land company conveying their several properties to their remote grantors, there being no restrictions in the immediate deeds to either of them; it imports a condition subsequent, enforceable by the land company alone, as the explicitly recited penalty for the breach thereof itself makes manifest—the forfeiture of the grantee's rights, and 'that the title to the land described herein in such event shall immediately be reinvested by force of this deed in the Omaha and South Texas Land Company, in fee simple without necessity for other further proceedings.' There are in it, furthermore, neither specific provisions investing other lot owners with the enforcement of what was thus reserved as a distinctly individual right in the original grantor, nor declaring that the burdens imposed in the particular deeds are either part and parcel of a general plan to restrict the entire Heights boulevard, or are intended for the benefit of other vicinal owners therein; it must therefore be construed as was a similar restriction in Pierson v. Canfield (Tex. Civ. App.) 272 S. W. 231, 233, where the court said: 'It will be observed that the restrictions contained in the deed, under which appellant * * * claims, are in form and meaning conditions subsequent. The conveyance by its terms provides that, should any condition be violated, the title to the lot of land shall revert to the grantors, their heirs, or assigns.' "

In response to a special issue requested by Overton, the jury found that there was a general agreement, scheme, or plan on the part of Overton and other property owners on Broadway street from Avenue Q to College avenue, "not including the Jackson property," to restrict said street to residential purposes only.

It is not clear that the language of the restriction itself supports this finding, but rather it would seem the restriction was inserted for the purpose of causing a reversion of the title in the event of its breach.

In our former opinion we quoted from 12 Tex. Jur. pages 150, 168–173, announcing the rule that, where a grantor sues upon the theory that his lots were sold pursuant to a general plan or building scheme, he must show that such a plan or scheme existed, that the presumption was that conveyances import the greatest possible estate compatible with the language of the deed, and that the existence of such a general scheme depends, not upon the intent of the common grantor alone, but upon the joint intent of the grantor and the grantees. It is there further held that uniformity in the restrictions imposed on the lots is one of the strongest proofs of the existence of a building scheme, and that a grantor may waive his right by acquiescing in a violation of the restrictions.

■ The record shows without contradiction that Overton had conveyed 33 of the lots within the restricted district which did not contain the restrictive clause found in the appellees' deed. This is some proof of the absence of a uniform scheme or plan of restriction, and such fact is sufficient to support the finding of the jury that the restriction had been waived.

After a careful review of the record, we are convinced that a proper judgment has been rendered, and it is affirmed.