199 P.2d 991

## HOOVER v. WAGGOMAN.
### No. 5095.

Supreme Court of New Mexico.
Nov. 24, 1948.

Iden & Johnson and James Paulantis, all of Alburquerque, for appellant.

W. A. Keleher and A. H. McLeod, both of Alburquerque, for appellee.

BRICE, Chief Justice.

The question is whether certain restrictive covenants contained in a deed conveying city lots, restrict the use of the land so that the grantee is precluded from its use for parking automobiles.

This action was brought by plaintiff (appellee) to enjoin the defendant from paving and using lots 1 and 2 of Block 55 of the University Heights addition to the City of Alburquerque for storing automobiles.

The material facts found by the court and its conclusions of law are in substance as follows:

"That the provisions of the deed from the subdivider and owner, conveying Lots 1 and 2 in Block 55 of the University Heights Addition, as well as the provisions in all other deeds conveying property in said addition (except the small portion designated for business), read as follows:

" 'The said party of the second part in consideration of the premises and of the sum of One Dollar to her in hand paid by the party of the first part, the receipt whereof is hereby acknowledged, for herself and her heirs and assigns, hereby covenants and agrees with the said party of the first part, its successors and assigns,

that the said party of the second part, her heirs or assigns, shall not erect upon said premises or permit or suffer to be erected or placed upon said premises any tent house and no building other than dwelling houses and such barns, garages or outhouses as may be necessary in connection with the use of said premises for dwelling purposes nor more than one dwelling house to be erected on any one lot. Nor shall any building of less than restricted value on the rear of the lot be used for dwelling purposes longer than four months from the date of construction, and all adobe buildings must be cement finished on the exterior within six months after construction, and no dwelling house and accompanying barns, garages, outhouses or porches thereon be placed nearer than 25 feet to the front line of the lot, and no dwelling house and accompanying barns and outbuildings shall be of less value than $4,100, nor shall any of such lots be subdivided or buildings fronted on side streets, nor shall any open or dry toilets be permitted on said premises, nor shall any solid board fences be constructed on the lots, nor shall any building erected on said lots be used as a store or sanitarium (sanitarium being defined as any place harboring three or more people afflicted with tuberculosis) or for any other purpose than as private dwelling places. It is understood and agreed that said covenants on the part of the grantees herein shall attach to and run with the land hereby conveyed, and the party of the first part or any owner of a lot in said Addition shall have the right to enforce compliance with said covenants by injunction or other legal proceedings, and in case the said party of the second part, her heirs or assigns shall persist in the violation of said covenants after notice to desist, the title hereby granted shall revert to and revest in the said party of the first part or its successors or assigns, shall be entitled to the immediate possession of said premises.'

"That the plaintiff is the owner of Lot 22 of Block 50 of the University Heights Addition to the City of Alburquerque, New Mexico, and that such lot is used by the plaintiff as a residence for himself and family.

"That the defendant has recently built a business block or unit on all or part of Block 56 of the University Heights Addition to the City of Alburquerque, New Mexico, and that such business unit contains a total of twenty-nine separate store units which are rented or are offered for rent for the conducting of different kinds of business.

"That the defendant is the owner of Lots 1 and 2 of Block 55 of the University Heights Addition to the City of Albuquerque, New Mexico, and that defendant intended to use such lots for parking

purposes for the tenants and their employees who will have store space in the business unit above referred to.

"That the defendant had graded said Lots 1 and 2 of Block 55 and intended to place an asphalt top of two inches on such property, and when paved defendant intended to have such lots used for parking in connection with the business unit above referred to.

"That it was the intent and purpose of the subdividers and owners of all the property which was platted as the University Heights Addition, that it was to be a restricted residential district, restricting the use of said property for private dwellings or residential purposes, excepting a certain small area that was designated in the Addition for business. The area designated for business does not cover Lots 1 and 2 of Block 55. The business designated district is very small as compared with the large portion of the district designated for private residences or dwellings. The whole general intent and purpose of the owners and subdividers of the district to restrict the property to private residences or dwellings would be thwarted, and the purchasers of the property who relied upon said restrictions to maintain homes in a restricted residential district would also be thwarted if the real estate could be used for business purposes or any other purposes ex-cept for private dwellings, regardless of whether the lots had actual buildings upon them, or not; that is, regardless of whether the buildings on the lots were used for other than residential purposes or merely whether the lots were used for purposes other than private residences.

\*    \*    \*    \*    \*    \*

"That the intent and purpose of the subdividers at the time the University Heights Addition was platted was to confine such property to private dwelling places, except for an area that was designated for business. Such area designated for business, however, does not cover Lots 1 and 2 of Block 55."

The trial court concluded that the building restrictions contained in the chain of title to Lots 1 and 2 of Block 55 of the University Heights Addition prohibits the use of such lots for any purpose other than private dwelling places, and particularly for the use of such property for parking automobiles.

The trial court entered a decree accordingly, perpetually enjoining the defendant from using, or attempting to use, the lots in question "as a parking lot, either for the customers that might trade at the business unit on Block 56 of said addition, or as a parking lot for the tenants in such business unit, or as a parking lot for the tenants' employees, or for any other purpose than as a place for private dwelling

places and the defendant is perpetually enjoined from paving such property for use as a parking lot."

It is asserted that the restrictions imposed upon the lots in question relate only to buildings that may · be erected thereon, but do not restrict the use of the land itself.

The part of the restrictive covenant here involved is in effect that "no building other than dwelling houses, and such barns, garages or outhouses as may be necessary in connection with the use of said premises for dwelling purposes, nor more than one dwelling house to be erected on any one lot * * * nor shall any buildings erected on said lots * * * be used for any other purpose than as private dwelling places."

It will be observed that no specific restriction is included in the covenant that applies to the land alone. As we understand the contention of defendant, it is that under the rule of strict construction which applies in such cases, the owner may use the land itself, before or after the construction of a dwelling house thereon, for any purpose, business or other purpose, for which it might have been used if such covenants were absent; provided the use shall not require the erection of buildings thereon. In other words, that there are no restrictions that preclude the use of the land for any "open air" business.

This contention is supported by numerous authorities, of which the defendant cites the following: Granger v. Boulls, 21 Wash. 2d 597, 152 P.2d 325, 155 A.L.R. 523; Jenney v. Hynes, 282 Mass. 182, 184 N.E. 444; Id., 285 Mass. 332, 189 N.E. 102; Shaddock v. Walters, Sup., 55 N.Y.S.2d 635; Cooke v. Kinkead, 179 Okl. 147, 64 P.2d 682; Himmel v. Hendler, 161 Md. 181, 155 A. 316. The deed involved in the Granger case had substantially the same restrictions as in the case here considered. It was held that such restrictions applied only to buildings, and did not prevent the owner of the land from using it for grazing or keeping cattle, pigs, chickens, and rabbits thereon. The Washington court said [21 Wash.2d 597, 152 P.2d 326]:

"The appellants contend that, since the court dismissed the private nuisance action, from which respondents did not appeal, it was error to restrain the appellants from pasturing or using the land to support any cattle, pigs, chickens, or rabbits in so far as it could be done without the use of a barn, chicken house, pig sty, or rabbitry on the premises covered by the covenant. The language of the covenant prohibits the erection of buildings to be used for any purpose other than as a private dwelling, but permits the erection of necessary out-buildings for residence uses.

\* \* \* \* \* \*

"Covenants, such as the one at bar, are very common. By their use, people ac-

complish the exclusion from the neighborhood of their residence, of the unpleasant and unattractive activities which however indispensable in the world are nevertheless capable of segregation without hardship or inconvenience. Undoubtedly, the covenants in the instant case were for the purpose of segregating the land into a private residential district. That it failed to restrict the use of the land itself for farming is clear, but is equally clear that it did prohibit the erection of farm buildings as distinguished from private dwellings."

In the Shaddock case a similar provision was construed where the question was whether a part of the lots could be used as a parking field for automobiles and trucks as accommodation for owners of water craft in the Bellmore Canal. The court stated [55 N.Y.S.2d 637]:

"A restrictive covenant, such as this, is to be construed most strictly against the covenant. An injunction should not issue unless the thing enjoined is plainly within the provisions of the covenant. Clark v. Jammes, 87 Hun 215, 33 N.Y.S. 1020. A close reading of the aforesaid restriction shows that it does not restrict the land to residential use. Its meaning is that no building shall be erected on the premises except one to be used for residential purposes only. No building has here been erected. It is only the use of buildings erected upon the property that is restricted to residential purposes. The covenant, therefore, does not prohibit the use to which defendants' property is being put."

The other cases are equally as strong in their support of defendant's contention.

But there is another rule adopted by some courts, not quite so strict, which no doubt the trial court had in mind in making his last two findings of fact hereinbefore quoted, and that is, that effect is to be given to the intention of the parties as shown by the language of the whole instrument, considered with the circumstances surrounding the transaction, and the object of the parties in making the restrictions.

In this connection the plaintiff argues:

"Plaintiff would like to call the court's attention to plaintiff's Exhibit 'A' (Tr. 62) which is a plat of the University Heights Addition. It will be noted from this plat that there are approximately 1380 lots in the subdivision, and the testimony of D. K. B. Sellers is that with the exception of only a few lots, residential restrictions were placed in all of the deeds conveying such lots, the only difference in such restrictions being that as to a certain part of the subdivision, the requirement as to the

cost of a residence was increased by $1,-000.00.

\*     \*     \*     \*     \*     \*

"If the defendant's contention is correct, that the restrictions do not apply to the use of the land, but only to the use of buildings constructed, we would have a situation where some several hundred people who have purchased lots and built residences in the addition could be greatly damaged. The owner of a home in the addition could overnight find that an outdoor skating rink, a tennis court, a baseball diamond, a football field, a swimming pool, or even a sawmill without walls around it, had sprung up next to his home and that his use of property as a residence had been greatly damaged. There are many other examples that could be cited as to what use the land could be put, if defendant is correct in his contention."

In support of his view plaintiff cites Laughlin v. Wagner, 146 Tenn. 647, 244 S.W. 475; Wilber v. Wisper et al., 301 Mich. 117, 3 N.W.2d 33; Mellitz v. Sunfield Co., 103 Conn. 177, 129 A. 228, which support his contention, and other cases supporting the general rule stated.

The facts stated are borne out by the record.

The covenant construed in the Laughlin case was as follows:

"Any house erected on the Belvedere side be used for residence purposes only, to be two stories or more in height, and to be built on established house lines."

There were thirty-five lots in the subdivision. The covenants in the deeds varied somewhat; in some of the deeds the covenant read:

"It is understood that said property is to be used for residence purposes only; that any residence erected thereon shall be erected so as to conform to the established property line on said street, and shall be at least two stories in height."

The Tennessee court said:

"In the construction of these restrictive clauses it is, of course, the duty of the court to give them a fair and reasonable interpretation, taking into consideration the position and situation of the parties to ascertain and determine the true meaning of the language used. But where the clause is susceptible of two different constructions, one favorable and the other unfavorable to the free use of the property, that construction should be adopted which assures its free use. A literal interpretation which would amount to a mere evasion of the real intention of the parties is not justified, but, if the clause may be given a reasonable interpretation in favor of the free use of the property, it should be done.

\*     \*     \*     \*     \*     \*

"The clause does not require that a dwelling house shall be erected on the lot,

and it is not intended to prohibit all uses thereof unless the house is built. It was evidently intended to prescribe the kind of building which should be erected, and the manner of and the particular use which should be made of the building itself. In other words, if the building had in all respects complied in form and location with that suitable as a residence, nevertheless the building could not be used for purposes not ordinarily and reasonably connected with such a use. On the other hand, whatever the character or form of the building, it would be permissible to use it for residential purposes, and if there be no building at all, it could be used for purposes consistent with and incident to its use for residential purposes."

In the Wilbur case the Michigan court said [301 Mich. 117, 3 N.W.2d 34]:

"The original plattor in conveying the lots in question to his first grantees inserted the following restrictive covenant in each conveyance: 'That he will not erect, keep, operate or maintain either directly or indirectly any saloon or store thereon or any other building except the necessary buildings for residence purposes. Second parties also agree that he will, if he build at all, erect a dwelling house of not less than $2,000.00 on each of the lots above mentioned. * * *'

"In 1909 the then owners of property on Monterey avenue entered into an agreement restricting the use of their property on Monterey, which was duly recorded in the office of the register of deeds for Wayne county, and which reads as follows: * * *

" 'That between Third Avenue and Hamilton Boulevard no building shall be placed on a lot of less than 40 feet frontage on Monterey Avenue, nor within 20 feet of the front line thereof on the south side nor within 25 feet of the front line on the north side of Monterey Avenue, and that nothing but a single dwelling house costing not less than $2500.00 and the necessary out-buildings shall be built or placed on any of said lots.'

* * * * * *

"Defendant Tuxedo Theatre Company purchased lots 236, 237, 238, and 239 with the intention of using them for parking lot purposes and with full knowledge of the restrictions. While it is true that the restrictive negative covenants, strictly construed, might be held to apply solely to the erection and use of buildings, they are obviously part of a general plan to prevent the use of property for business purposes to the detriment of a strictly residential district. These restrictive negative covenants, fairly construed, prevent use of these lots for business purposes."

In the Mellitz case the Connecticut court approved the reasoning of the Laughlin case. The restrictions provided that "No

building shall be erected on said premises (with exceptions) to be used for any other purpose except dwelling or to be occupied by more than two families." The court said:

" * * * The restriction in the deed to Linsky limits the building to be erected thereon to a dwelling house to be occupied by not more than two families and limits the occupancy of the building to be errected to the purpose of a dwelling. Exclusive of this lot, 30 lots on this tract were similarly restricted, and as to the 13 fronting on Fairfield avenue the restriction limited the erection of buildings thereon to be occupied for a store, or a store with one family, and the store was to be used for the sale of ordinary merchandise. Reading these restrictions together, and considering the purpose of the grantors, it seems plain that they intended to restrict all portions of this tract, including this corner lot, to residential purposes, and that none of it was to be used for business purposes except the 13 lots on Fairfield avenue, and that the business to be conducted on these 13 lots was further restricted to stores 'to be used for the sale of ordinary merchandise.' "

The Court of Appeals of Kentucky in Holliday v. Sphar, 262 Ky. 45, 89 S.W.2d 327, 328, construed the following restriction:

"No dwelling house shall be built in any part of said addition, when laid off into streets, lots and alleys, closer than 25 feet to the pavement line, and no residence shall be built on Boone avenue or Belmont street, which is now known as the Colbyville Pike, costing less than thirty-five hundred ($3500.00)" dollars.

Holliday declared his intention to conduct a service station on one of the lots; a number of witnesses testified that the owners had restricted the use of the lots for residences only, and this had influenced their sale. It was held in this case that the restrictive covenant did not prevent the placing of the service station on one of the lots.

The same type of reservation appears in a deed construed in Dorsey v. Fishermen's, etc., Co., 306 Ky. 445, 207 S.W.2d 565, 566, in which it was held that the restriction included the land. The losing party cited the Holliday case, regarding which the Kentucky court said:

"In the Holliday case we held that, since the restrictions related only to the minimum cost of residences and to building lines, the use of the lots in the subdivision was not restricted solely to residential purposes, but would permit the construction of a gasoline service station. * * *

"While we do not feel called upon to overrule the Holliday case at this time, we may say in passing that we now entertain some doubt as to the correctness of

that ruling. A careful analysis of the wording of the restrictions pertaining to Lot 15, coupled with a consideration of all the facts and circumstances pertaining to the establishment of the Hollywood Subdivision, which have been noted heretofore, leads us to the conclusion that the chancellor erred in holding that a commercial building may be erected on Lot 15. We think it was intended that all of the lots in the Subdivision be used for residential purposes and that the words 'only one dwelling (except servants' quarters)' meant that only a dwelling house could be constructed on any of the lots in the Subdivision."

The covenant construed in Meyer v. Stein, 284 Ky. 497, 145 S.W.2d 105, recited that the property conveyed "shall be used only for the erection of a single residence and no residence shall be erected thereon that shall cost less than $5000". Regarding this covenant the Kentucky court said:

"Restrictions upon the free alienation of property are not favored by the law and are usually strictly construed against those seeking to enforce them. This rule applies to building restrictions. However, if building restrictions are reasonable, they are uniformly enforced by courts and are given the effect intended by the parties as gathered from the conveyance in the light of surrounding circumstances. * * *

"No one can read the restrictive covenants in the deeds conveying this property and escape the conclusion that it was the intention of the parties to, and they did, limit the use of the property to residential purposes. If we should accept appellant's argument that such covenants related only to the building of the homes, and placed no limitation upon their use after they were once constructed in conformity with the restrictions, then building restrictions would render the owners of property no benefit and parties incorporating such restrictive covenants in their deeds would be doing a vain thing."

The restriction construed in Aller v. Berkeley Hall School Foundation, 40 Cal. App.2d 31, 103 P.2d 1052, 1054, was, "'All buildings to be erected on Doheny Drive' shall be exclusively for private residences". The California court said:

"It is clear that the restriction in the deed which provides that 'all buildings to be erected on Doheny Drive' shall be exclusively for private residences, means that all lots fronting on Doheny drive are to be used for residence purpose."

The covenant construed in Bohm v. Rogoff, 256 Mich. 199, 239 N.W. 320 recited, "Nothing but one single dwelling house, of two or more stories and the necessary outbuildings shall be erected on each lot." A miniature golf course was placed on the

land. In holding that it violated the covenant the court said:

"It avails defendants nothing to contend that the restriction applies only to the kind of buildings to be erected, and not to the use of the property. This contention runs counter to the manifest intent of the restriction, and would fritter away its benefit."

The covenant construed in Ragland v. Overton, Tex.Civ.App., 44 S.W.2d 768, 769, provided "that when the Vendee, his heirs, assigns or legal representatives, place improvements upon the lots herein conveyed, that the residence to be erected and thereafter maintained shall cost not less than $1,500.00, to be used exclusively for residence purposes". The contention was that this restriction did not forbid plaintiffs using and improving their lots for business or commercial purposes. The Texas court said:

"We think the language of the restrictive clause, when considered alone, is sufficient to prohibit the use of the lots for other than residential - purposes and to prevent the construction of any dwellings thereon which cost less than $1,500 each."

This court in Rowe v. May, 44 N.M. 264, 265, 101 P.2d 391, 396, in construing a restrictive covenant indicated that the less strict rule should be followed.

"Aside from any consideration of the circumstances presented by the case at bar favoring the promotion of a high class residential area under which this addition was platted and sold (which the court had a right to, and which it did in fact consider, making findings favorable to defendants), the language of the covenant itself, identical in all deeds in the area, taken alone, could bear no other reasonable inference than that such deeds from the original grantor, the corporation, gave sufficiently adequate and clear expression to its intention that the restriction was for the benefit of all the lots, and, that since the restrictions, being of the character they were, and imposed uniformly upon all, it was inescapable by fair and reasonable inference, that the purpose was to preserve its genuine residential character, the symmetry and beauty of the area, and for the general good of all interested, in making this an attractive and valuable residential district."

Also see Snow v. Van Dam, 291 Mass. 477, 197 N.E. 224 and annotations in 155 A. L.R. 528, and 175 A.L.R. 1196.

The University Heights addition to the City of Albuquerque is made up of seventy blocks divided into more than 1300 lots, all but a few of which are so restricted. The restriction, though not as definite as it should be, leaves no doubt in our minds, when considered with the scheme of subdivision and the character of buildings permitted to be built on the lots contain-

ing the covenant, but that it was the intention of the seller and purchasers that the use of the lots as well as the buildings was limited to residential purposes, and we so hold.

The decree of the district court should be affirmed, and it is so ordered.

LUJAN, SADLER, McGHEE, and COMPTON, JJ., concur.