689 P.2d 178

**LA ESPERANZA TOWNHOME ASSOCI-ATION, INC., an Arizona Non-Profit Corporation, Plaintiff/Appellant,**

v.

**TITLE SECURITY AGENCY OF ARIZO-NA, as Trustee Under Trust T–285, and Lyman E. Ostlund, Defendants/Appellees.**

**No. 2 CA–CIV 5001.**

Court of Appeals of Arizona, Division 2.

May 24, 1984.

Review Denied Oct. 10, 1984.

Chandler, Tullar, Udall & Redhair by Steven Weatherspoon, Tucson, for plaintiff/appellant.

Slutes, Sakrison, Grant & Pelander, P.C. by Tom Slutes, Tucson, for defendants/appellees.

## OPINION

HOWARD, Judge.

This action relates to a subdivided townhome development in Tucson and the effect of a revision to the original subdivision plot and amendment to the declaration of covenants, conditions and restrictions.

In 1973 Tom Kennedy and his wife purchased from Ted Bloodworth some land in Tucson which had frontage on East Broadway, a main east-west traffic artery. The Kennedys subdivided the land into townhouse lots and recorded a Declaration of Covenants, Conditions and Restrictions (the Declaration) with the office of the Pima County Recorder. This purchase was secured by a land trust agreement which made Bloodworth the first beneficiary. The declarations contained the following pertinent provisions:

" * * *

WHEREAS, Declarant is the owner of certain property in Tucson, Pima County, Arizona, which is more particularly described as

La Esperanza, lots 1 through 35, as shown on the plat as recorded in the Pima County Recorder's Office, Book 25, page 1.

NOW THEREFORE, Declarant hereby declares that all the properties described above shall be held, sold and conveyed subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with, the real property and be binding on all parties having any right, title or interest in the described properties or any part thereof, their heirs, successors and assigns, and shall insure to the benefit of each other thereof.

\* \* \* \* \* \*

*Section 3. Amendment.* The covenants and restrictions of this Declaration shall run with and bind the land, for a term of twenty-five (25) years from the date this Declaration is recorded, after which time they shall be automatically extended for successive periods of ten (10) years. This Declaration may be amended during the first twenty-five (25) year period by an instrument signed by not less than ninety per cent (90%) of the Lot Owners and thereafter by an instrument signed by not less than seventy-five percent (75%) of the Lot Owners ...."

The agreement between Bloodworth and the Kennedys provided that when construction would begin with respect to individual lots, those lots would be conveyed by the trustee, Stewart Title and Trust, to Kennedy personally and upon completion of construction of each townhome, the lot would be conveyed by Kennedy to the purchasers.

The original subdivision plat created 30 townhome lots, four detached garages which were to be considered one unit and sold concurrently with four of the townhome lots and lot 35 which constituted the common area of the townhome development.

Because of financial difficulties, the Kennedys decided to turn the project back to

Bloodworth in 1975 but Bloodworth was unwilling to take it without certain modifications. Primarily, the south 223-foot portion of the subdivision, the part which fronted on Broadway, was determined by Bloodworth and Kennedy to be unsuitable for townhouse development but, instead, suitable for multiple unit and multi-story unit development.

Accordingly, the Kennedys had Stewart Title & Trust file an amendment to the Declaration which excluded the southerly 223 feet of the subdivision from its terms.

At the time that Stewart Title executed the amendment to the covenants, it owned 22 of the 30 townhouse lots within the subdivision, the Kennedys owned four lots and four lots were owned by third persons. In conjunction with the amendment, the Kennedys filed and signed with Stewart Title their authorization and direction that Stewart Title & Trust record the amendments.

At the same time that the Kennedys instructed Stewart Title to execute and record the 1975 amendment, they also instructed Stewart Title to prepare a conveyance of lot 6 within the subdivision from Kennedy to a party by the name of Baker. It was Kennedy's intent that the amendment be executed and recorded prior to the conveyance of lot 6 to the Bakers, however, these transactions and recordings were accomplished in reverse order. After the recording of the amendment, the Bakers and the owners of lot 17, Kenneth and Anne Ludeke executed affidavits stating that they approved and ratified the 1975 amendment.

Subsequently, Bloodworth transferred his interest in the property to Lou Beck and Doug Marshall, and this group then transferred the property to the defendant Ostlund who acquired title to 15 of the townhome lots, three of the detached garages and lot 35, the common area. In February 1980 Ostlund conveyed these 15 lots, three detached garages and the common area to defendant Title Security as trustee under T–285.

In May 1980 Title Security executed and recorded a revised plat to the La Esperanza Townhomes which resubdivided portions of the property. This revision purportedly eliminated the seven townhome lots which had existed within the south 223 feet of the property and also revised the boundaries of eight lots previously plated on the eastern portion of the property replacing those eight lots with nine lots. On the revised plat, the south 223 feet of the property which formerly contained seven townhome lots were converted to what is referred as Block 1. The May 1980 revision to the subdivision plat was approved and executed only by Title Security which, at that time owned 15 townhome lots or 50 percent of the lots within the subdivision.

This case was then filed by the plaintiffs seeking a declaration that the revision to the plat and the amendment to the Covenants were void and of no force and effect. The defendants counterclaimed seeking a declaration that the plat revision and amendment to the Declaration were valid and enforceable.

The case was tried to the court, sitting without a jury, which entered judgment dismissing plaintiff's complaint and in favor of defendants on their counterclaim. The trial court's judgment declared that the amendment to the Declaration was valid and in full force and effect and that the revision to the original subdivision plat was valid and binding upon the real property in question. Plaintiffs contend that the trial court erred since the amendment and plat revision were null and void. We agree.

As for the amendment of 1975, although there was a question below as to whether the amendment was signed by the requisite number of landowners, we believe the case turns on the fact that the amendment purports to affect only part of the lots in the subdivision.

In *Riley v. Boyle*, 6 Ariz.App. 523, 434 P.2d 525 (1967) we were faced with a case which had the following provision in the covenants and restrictions:

"The owner or owners of 51% of the lots in this subdivision shall have the

right to amend or change these conditions, reservations and restrictions for the beneficial improvement and interest of WESTRIDGE ESTATES." 6 Ariz. App. at 524, 434 P.2d 525.

The restrictive covenant in *Riley*, as originally constituted, prohibited the construction of two-story dwellings and required all construction to be of brick or burnt adobe. The defendant had constructed a wooden two-story residence. However, prior to the defendant's construction, 51 percent or more of the owners of the lots within the subdivision amended the covenants to remove the two-story prohibition as to defendant's lot and also amended the injunctive relief section of the restrictive covenants making it inapplicable only to defendant's lot. The amendment also modified another provision of the restrictive covenants but that change was applicable to all the lots. Other than those changes all the provisions of the covenants remained intact.

We held that any amendment to a set of restrictive covenants must have uniform application to all lots in the subdivision and an amendment which purported to modify the restrictions only as to one lot or a number of lots, but not all the lots, was null and void. We stated:

"The restrictions imposed pertain to *all* lots in the subdivision and a fair construction of the words permitting amendments indicate that the power to amend is only as to restrictions for all lots in the subdivision." (Emphasis added) 6 Ariz.App. at 526, 434 P.2d 525.

We held that to construe the amendment language to permit 51 percent of the lot owners to exempt their property from some or all the restrictions while leaving the remainder of the subdivision subject to those restrictions would lead to an unintended result. We stated:

"Certainly such an interpretation could easily result in a patchwork quilt of different restrictions according to the views of various groups of 51 per cent and completely upset the orderly plan of the

subdivision." 6 Ariz.App. at 526, 434 P.2d 525.

Other courts have been faced with situations similar to the one at hand and have reached conclusions consistent with our holding in *Riley*.

In *Montoya v. Barreras*, 81 N.M. 749, 473 P.2d 363 (1970) a number of lot owners in the subdivision had entered into an amendment or a "Consent to Change of Protective Covenants" whereby all the restrictive covenants were removed from plaintiff's lot by permitting it to be used for commercial purposes. The original covenants restricted lots within the subdivision to residential use. The court reviewed the covenant provisions relative to modification and held that they could not be construed to permit the removal of the restrictions only as to one lot. The court stated:

"Historically, restrictive covenants have been used to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability. To permit individual lots within an area to be relieved of the burden of such covenants, in the absence of a clear expression in the instrument so providing, would destroy the right to rely on restrictive covenants which has traditionally been upheld by our law of real property."

\* \* \* \* \* \*

Restrictions as to the use of land are mutual, reciprocal, equitable easements in the nature of servitudes in favor of owners of other lots within the restricted area, and constitute property rights which run with the land. [citation omitted] Where the covenants manifest a general plan of restriction to residential purposes, such covenants constitute valuable property rights of the owners of all lots in the tract." 473 P.2d at 365.

The New Mexico court then went on to cite with approval our holding in *Riley v. Boyle*, supra, and determined that to the extent the lower court's decree permitted the plaintiff's lot to be relieved of, or ex-

cluded from the operation of the restrictive covenants, it was error.

In *Lakeshore Estates Recreational Area, Inc. v. Turner*, 481 S.W.2d 572 (Mo. App.1972) the restrictive covenants permitted their abrogation or modification upon the written consent of two-thirds of lot owners in the subdivision. A 1964 amendment was enacted which stated that no lot in the subdivision could be used for other than residential purposes except lot 24. On that lot any use authorized by the applicable zoning classification was permitted.

The court held that when a person purchased a lot in a subdivision subject to the covenants, his property became burdened with those restrictions and he also acquired a right to expect compliance with the restrictions on the part of all the other lot owners. The court ultimately held that the amendment was invalid because it attempted to release the restrictions on a single lot to permit a commercial use and since this action was not uniform in application to all of the property originally affected, the amendment was a nullity.

In *Ridge Park Home-Owners v. Pena*, 88 N.M. 563, 544 P.2d 278 (1975) the court, following *Montoya v. Barreras*, supra, held that unless there were a specific provision in the original covenant which permitted otherwise, the required number of lot owners could not change the applicability of a restrictive covenant as to a few lots but the change must apply to all lots. As the restrictions in the *Ridge Park Home-Owners* case restricted all lots in the subdivision for residential purposes except for two blocks in the subdivision which could be used either for commercial or residential purposes and the amendment attempted to permit commercial development on two lots which were not in the originally excepted blocks, the court held that this was not permissible.

A similar result was reached in *Cowherd Development Company v. Littick*, 361 Mo. 1001, 238 S.W.2d 346 (1951) where the court held that an extension clause and a set of restrictive covenants did not authorize the owners of a majority of the front footage in the subdivision to extend restrictions as to some of the lots for another 25 years and release those restrictions as to others.

▪ Of course, if *all* of the landowners joined in an amendment it need not have a uniform effect. See *Steve Vogli Company v. Lane*, 405 S.W.2d 885 (Mo.1966).

▪ It is clear from reading the Declaration here that the restrictions and conditions can only be changed uniformly. They do not grant any powers to make changes in any other basis.

▪ Defendants contend this case is distinguishable from others because here, the south 223 feet of the subdivision were being released from all of the covenants as opposed to only one or a few of the covenants, conditions and restrictions. We find this to be a distinction without a difference.

▪ Defendants also argue that when the landowners who are now members of the plaintiff association purchased their property, they did so after the year 1975, after the amendment, and did not therefore, rely on the original restrictions and therefore cannot now object. We do not agree. In *Riley v. Boyle*, supra, we held the purported amendment to be null and void. Amendments which are not properly executed never become effective. See *Hein v. Lee*, 549 P.2d 286 (Wyo.1976). When the purchasers bought the property after the 1975 amendment they did so subject to the void amendment. Their mere purchase of the property did not operate to validate a document that never took effect. Nor can we say that the mere purchase of the property with the 1975 amendment of record induced Ostlund, who testified he would never have purchased the property if he had known that the 1975 amendment was invalid, to act to his detriment. In fact, there was some burden upon Ostlund, who was going to commercially develop the property, to make sure that there were no impediments that would adversely affect his goals. The 1975 amendment, although not invalid on its face, raised a red flag

since it purports to change the restrictions on only a portion of the subdivision. Had Ostlund further investigated, he would have discovered that not all the landowners had agreed to the amendment and that it was null and void.

As can be seen from the language of the Declaration, the plat of La Esperanza recorded in the Pima County Recorder's Office in Book 25, page 1, became a part of it. Ostlund's filing of a new plat constituted an attempt to amend the declaration and since there was no instrument signed by 90 percent of the lot owners, the new plat was invalid. Ostlund suggests in his answering brief that the plaintiff-homeowner's association is estopped from asserting the invalidity of the new plat because it sat idly by while he expended several thousand dollars in architectural and engineering fees. Assuming, arguendo, that estoppel would lie in such a factual situation, the record does not support his claim. It shows that when the association first knew of his plan, he had already filed his revised plat and spent a large portion of the funds. The judgment of the trial court is reversed with directions to enter judgment in favor of the plaintiffs declaring that the amendment of 1975 and the plat filed by Ostlund are null and void.

BIRDSALL, C.J., and HATHAWAY, J., concur.