A01A1221. LICKER et al. v. HARKLEROAD et al.
(558 SE2d 31)

POPE, Presiding Judge.

Covenants and restrictions applicable to the residential real estate development at issue in this case provide that they can be amended if 90 percent of the lot owners agree. Ninety percent of the lot owners, who wanted to allow commercial use of the property, attempted to amend the covenants and restrictions so that they no longer applied to the voting owners' lots. Ten dissenting residents claim that these amendments are invalid because they do not apply uniformly to all lots in the development, they exceed the power to amend provided by the covenants, and the majority did not actually get ninety percent of the vote. We hold that because the amendments did not have uniform application, they are void.

Surrey Farms (located in Snellville adjacent to Ronald Reagan Parkway) was planned as a subdivision with over 100 homes, a swimming pool, and tennis courts. But, as of 2000, 12 years after it was chartered, only 18 homes had been built, there was no homeowners association or amenities, and the pool and clubhouse had been closed. The developer has abandoned the project, and investors have purchased the undeveloped lots.[1]

---

[1] Although these facts might suggest a change in the condition of the development that could justify a finding that the restrictive covenants should no longer be given effect, that issue was not raised in the trial court.

Meanwhile, in the late 1980s, Donald Harkleroad — Jr. and Sr. — acquired three of the lots for the purpose of expanding the parking lot at their adjacent office park. In that regard, on November 10, 1999, 93 lot owners, or 88.6 percent of the total 105 lots, voted to amend the Declaration of Covenants to remove the Harkleroads' three lots from the coverage of the restrictive covenants and, simultaneously, voted to reduce the percentage of lot owners needed to make future amendments to the Declaration from 90 to 75. Later on the same day, 85 lot owners, or 81 percent, agreed to remove 89 additional lots from the coverage of the restrictive covenants. Both amendments were recorded on November 17, 1999. Four months later, two additional lot owners consented to the first and second amendments, thereby allegedly raising approval of the first amendment to 90 percent.

When the Harkleroads petitioned the city of Snellville to rezone the lots for commercial use, the city refused absent a judicial determination of the validity of the amendments to the Declaration. So, the Harkleroads filed this quiet title action to remove any cloud upon their title. Ten of the homeowners, including Wayne and Maryellen Licker, opposed the petition.[2] A special master was appointed, who, after a hearing, upheld the amendments and found that the three lots were not subject to the restrictive covenants.[3] The trial court entered findings of fact and conclusions of law affirming the special master's holding and granting the Harkleroads' petition to quiet title.

The parties agree that Surrey Farms is not subject to either the Georgia Property Owner's Association Act or the Georgia Condominium Act.

1. The Declaration of Covenants provides that the covenants and restrictions will run with the land for 20 years and that, during that time, they can be amended by a vote of "not less than 90 percent of the lot owners." Article XI, Section 2, Amendments provides:

> These covenants and restrictions may be amended during the first twenty (20) years from the date of this Declaration, by an instrument signed by not less than ninety percent (90%) of the Lot Owners and thereafter by an instrument

---

[2] The other appellants are James H. Plante, Jeffery N. White, Kenneth J. Brockway, Carlos M. Tavares, Anthony and Renee White, Marcus F. Brooks, Sandy S. Rim, Johnne V. Perry, and Richard and Virginia Arndt.

[3] After the special master ruled, a third amendment, approved by 75 percent of the lot owners, purportedly removed all restrictions from all lots. That amendment was not considered by the trial court because, as stated by the trial court, "the evidence in this case has been closed for over six months." Therefore the issue of the validity of that amendment is not before us because the appellants have not had an opportunity to present evidence in opposition to the third amendment.

signed by not less than seventy-five percent (75%) of the Lot Owners. Any amendment must be properly recorded.

The trial court opined that since the Declaration did not impose any limits on the types of amendments allowed, the amendments were passed "in conformity to the express language of the Declaration." The court then reasoned that restrictions on the lawful use of land, like the restriction to use the property for residential purposes only, are generally disfavored and thus deserve strict construction in favor of those burdened by them. Accordingly, the court held that the amendments were valid.

2. We disagree with application of the rule of strict construction under these circumstances. As explained below, that rule does not override the rule that the entire document must be considered when determining the intention of the parties. Considering the entire Declaration reveals that the parties intended to form a uniformly residential community. It follows that amendments that allow commercial use are not valid unless they apply uniformly to all lot owners.

(a) In Georgia, "[t]he general rule is that the owner of land has the right to use it for any lawful purpose. Restrictions upon an owner's use of land must be clearly established and must be strictly construed. [Cit.] Moreover, any doubt concerning restrictions on use of land will be construed in favor of the grantee." (Punctuation omitted.) *Douglas v. Wages*, 271 Ga. 616, 617 (1) (523 SE2d 330) (1999). See also *Elder v. Watts*, 252 Ga. 212 (312 SE2d 331) (1984).

However, when applying this general rule of construction, the court must consider the entire document and not merely the provision in question. *Shoaf v. Bland*, 208 Ga. 709, 710-711 (2) (69 SE2d 258) (1952). As explained by the Supreme Court, "In the construction of an instrument, 'the whole instrument is to be construed together so as to give effect, if possible, to the entire deed . . . and the construction which will uphold a deed in whole and in every part is to be preferred.' *Simpson v. Brown*, 162 Ga. 529 (134 SE 161) [(1926)]." Id. at 711 (2). See also *Elite Realty Svcs. v. City of Auburn*, 272 Ga. 195, 197 (528 SE2d 236) (2000) (restrictive covenant should be construed "so as to give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect") (citations and punctuation omitted); *Garland v. Carnes*, 259 Ga. 263 (379 SE2d 782) (1989); *Davis v. Miller*, 212 Ga. 836, 837 (96 SE2d 498) (1957).

In *Shoaf*, the Court was asked to reconcile the meaning of two seemingly incompatible restrictive covenants. 208 Ga. at 711. The first of the covenants read: "All lots in the tract shall be known, described, and used solely as *residential lots. . . .*" (Punctuation

omitted; emphasis supplied.) Id. While the second restrictive covenant read: "No noxious, or offensive *trade* shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance in the neighborhood." (Punctuation omitted; emphasis supplied.) Id. The Court determined the preferred construction was to give effect to both provisions consistent with the intention of the parties. Id. The Court concluded the first provision restricted the type of building allowed on a lot, while the second provision restricted the use to which that building may be put. Id.

The Georgia approach is consistent with other States and the Restatement of the Law of Servitudes. See, e.g., *Montoya v. Barreras*, 81 N.M. 749, 751 (473 P2d 363, 365) (1970) (Before strictly construing restrictive covenants courts must recognize that " 'effect is to be given to the intention of the parties as shown by the language of the whole instrument, considered with the circumstances surrounding the transaction, and the object of the parties in making the restrictions.' ") (quoting *Hoover v. Waggoman*, 52 N.M. 371, 376 (199 P2d 991) (1948)). Section 4.1 of the Restatement of Servitudes reads: "A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created." Restatement (Third) of Property (Servitudes) § 4.1 (1) (2000). See also id., comment a.

Accordingly, the trial court erred in strictly construing the restrictive covenants in favor of the Harkleroads without considering the entire document.

(b) Construing the Declaration by the language of the whole instrument shows that Surrey Farms was intended to be a residential community free of commercial intrusion.

The preamble to the Declaration expresses the desire that Surrey Farms was to be a "residential community with common facilities for the benefit of the community." The document established a homeowners association to manage the subdivision and also to preserve its values and amenities. To aid the association, the Declaration sets forth certain covenants and restrictions intended to inure to the benefit of the property and homeowners, which run with the land for a period of 20 years. In an Article entitled "Common Scheme Restrictions," the Declaration expressly restricts the use of lots to "private single family resident purposes." Other provisions are consistent with this express restriction and imply a limitation to residential use only.[4] These restrictions apply to all lots in the development, and all

---

[4] Article VIII requires property owners to submit plans to an architectural control committee before proceeding with any plans to build a "residence, accessory building, tennis court, swimming pool, antennae . . . , flagpoles, fences, walls, exterior lighting, or other

lots were sold subject to them.

Therefore, any doubt concerning the construction of the restrictive covenants in this case will be resolved in favor of upholding the intent to create a residential use development with restrictions applicable to all lots.

(c) Construing the power to amend the covenants in this fashion leads to the conclusion that amendments that remove the restriction against commercial use from less than all the lots are not valid without the consent of the adversely affected property owners.

While Georgia has not directly addressed the issue of uniform application of amendments pertaining to common-interest communities, the Restatement of the Law of Servitudes is instructive. Section 6.10 of the Restatement reads in part: "Amendments that do not apply uniformly to similar lots or units . . . are not effective *without the approval of members whose interests would be adversely affected unless the declaration fairly apprises purchasers that such amendments may be made.*" (Emphasis supplied.) Restatement (Third) of Property (Servitudes) § 6.10 (2) (2000). The comments to this section explain that courts commonly protect the reliance interests of community members and disfavor nonuniform amendments which shift the benefits and burdens of community restrictions without the consent of those affected. Id. at comment f. That comment notes two exceptions to the rule disfavoring nonuniform amendments: (1) a change in conditions rendering the restrictions unreasonable, or (2) the declaration expressly puts purchasers on notice that such amendments may be made. Id. The trial court noted that the parties did not raise a change of conditions or introduce evidence on that issue. And, the Declaration did not fairly put the purchasers on notice that individual lots could be removed from the effect of the restrictive covenants.

A number of state court cases from other jurisdictions support the rule articulated in the Restatement. The New Mexico Supreme Court in *Montoya v. Barreras*, 81 N.M. 749, found the removal of residential restrictions on one lot only within a common-interest community was improper. The court opined that since the original restrictions found in the granting clause of the declaration applied to all the lots within the community, any changes to those restrictions must likewise be made to effect all the properties. Id. at 366-367. In sup-

---

improvements. . . ." This list suggests proposed structures are limited solely to residential purposes. The various Common Scheme Restrictions listed in Article IX similarly contemplate only residential use. Those restrictions concern such items as the placement of trash containers and clothes lines, whether pets other than household pets can be kept on a lot, whether a temporary house or trailer may remain on a lot, and whether commercial vehicles may remain in a driveway for purposes other than making pickups and deliveries.

port of its holding, the court focused on the intrinsic nature of common-interest communities and their reliance on restrictive covenants:

> Historically, restrictive covenants have been used to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability. To permit individual lots within an area to be relieved of the burden of such covenants, in the absence of a clear expression in the instrument so providing, would destroy the right to rely on restrictive covenants which has traditionally been upheld by our law of real property.

Id. at 365. The court also reasoned that the removal of burdens on only certain lots would affect the "valuable property rights of the owners of all lots in the tract." Id. at 365-366. Similarly, the court in *Cowherd Dev. Co. v. Littick*, 361 Mo. 1001 (238 SW2d 346) (1951), struck down a nonuniform amendment removing restrictive covenants from a handful of lots and noted, "[s]uch restrictions are supposed to be an assurance that the purchasers of lots may build homes thereon and be immune from the attacks of commercial expansion." Id. at 1007. See also *Walton v. Jaskiewicz*, 317 Md. 264, 267 (II) (563 A2d 382) (Spec. App. 1989) (removal of restrictions must apply to all lots uniformly "absent specific authorization in the declaration"); *La Esperanza Townhome Assn. v. Title Security Agency of Arizona*, 142 Ariz. 235, 239 (689 P2d 178) (App. 1984) ("restrictions and conditions can only be changed uniformly"); *Ridge Park Home Owners v. Pena*, 88 N.M. 563, 565 (544 P2d 278) (1975) ("Absent a specific provision in the agreement stating otherwise, we hold that the requisite vote cannot change the applicability of restrictive covenants to a few of the lots; the change must apply to all lots."); *Lakeshore Estates Recreational Area v. Turner*, 481 SW2d 572 (Mo. App. 1972) (two-thirds of lots may not remove restrictions on a single lot); *Riley v. Boyle*, 6 Ariz. App. 523 (434 P2d 525) (1967) (where restrictions affect all lots within a community, the power to amend, likewise, pertains to all properties).

As in *Montoya*, in this case the drafters of the Declaration intended the covenants and restrictions to apply to all properties within the subdivision.[5] The selective removal of restrictions abro-

---

[5] Paragraph 2 of the Declaration's preamble reads:
WHEREAS, Developer desires to provide for the preservation of the values and amenities in said community and for the maintenance of said common facilities; and to this end, desires to subject the real property described in Article II to the

gated this intent. While the Declaration contemplated future amendments, construing the scope of amendments to include nonuniform application would only frustrate the express purpose of community. As observed by the court in *Riley*, should the nonuniform application of amendments be allowed to stand, the result would be "a patchwork quilt of different restrictions . . . completely upset[ting] the orderly plan of the subdivision." 6 Ariz. App. at 526.

Ultimately, the amendments would create a mixed-use community from one intended as solely residential with the burdens created by the amendments falling squarely on the shoulders of the remaining property owners. The redistribution of the benefits and burdens of community ownership in favor of the purchasing investors was improper without the consent of the affected property owners. Such consent is necessary because the amendments not only dismantled the reliance interest of homeowners but destroyed their valuable property rights. The facts of this case are no different from a situation where, in the first year of a similar development's twenty-year term, after individuals have purchased ten of the lots and built homes, an investor purchases the remaining lots and votes to exempt his lots from the restrictions.

The Harkleroads have not raised either exception to the general rule disfavoring nonuniform amendments, and, therefore, the amendments ignoring the express and implied intent of the Declaration are invalid.

3. The trial court did not reach the issue of the validity of uniform amendments that effectively scuttle the entire development prior to the initial 20-year term. Because the First and Second Amendments were not uniform, they are invalid and we need not reach this other argument. Similarly, the issue of whether a full 90 percent of the lot owners voted for the First and Second Amendments is moot.

*Judgment reversed. Blackburn, C. J., and Mikell, J., concur.*

DECIDED NOVEMBER 20, 2001 —
RECONSIDERATION DENIED DECEMBER 13, 2001 —

*Weissman, Nowack, Curry & Wilco, Jeffrey H. Schneider*, for appellants.

---

covenants, restrictions, easements, charges and liens, hereinafter set forth, and all of which is and are for the benefit of said property and each Owner thereof. . . .

*Schreeder, Wheeler & Flint, David H. Flint, Lynn C. Stewart, Andersen, Davidson & Tate, Gerald Davidson, Jr.*, for appellees.